Richard CEPULONIS, et al.,
Plaintiffs, Appellees,

v.

Michael V. FAIR, et al., Defendants,
Appellants.

No. 83–1480.

United States Court of Appeals,
First Circuit.

Argued Dec. 5, 1983.

Decided March 29, 1984.

Alexander G. Gray, Jr., Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for defendants, appellants.

Suzanne E. Durrell, Boston, Mass., with whom Richard W. Renehan, and Hill & Barlow, Boston, Mass., were on brief, for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and MALETZ,[*] Senior Judge.

LEVIN H. CAMPBELL, Chief Judge.

This class action was brought by inmates of the Departmental Segregation Unit ("DSU")[1] of the Massachusetts Correctional Institution at Walpole ("MCI-Walpole") against officials of the Massachusetts Department of Corrections, claiming that defendants had defaulted in their constitutional obligation, defined in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), "to assist [them] in the preparation and filing of meaningful legal papers by providing ... [an] adequate law librar[y] or adequate legal assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498.[2] The district court, 563 F.Supp. 659, found for plaintiffs. Defendants appeal from this finding and from the court's remedial order which directs the establishment of a satellite law library holding certain volumes, and the provision of assistance by second and third year law students for five hours a week.

I.

Most of the facts are not in dispute. The parties stipulated that the DSU at MCI-Walpole is the most secure unit in the entire Massachusetts correctional system. Many of its 60 inhabitants have committed crimes against guards or fellow inmates. All are believed to present disciplinary or security problems. For this reason, their activities in comparison to most other prisoners are severely restricted—including, when suit was brought, their access to the prison law library. Only one DSU inmate was permitted to use the library at a time, and then only upon making an appointment in advance for a time when no other inmates were present except, perhaps, an inmate law clerk. When in the library, a DSU prisoner was guarded by two correctional officers. Prior to entering the library, DSU prisoners were required to identify the materials they wished to use.

The parties agreed that DSU inmates were allowed to use the library for a total of 26 hours per week—about a half hour

---

[*] Of the United States Court of International Trade, sitting by designation.

[1] The class also included inmates confined in isolation cells for periods of up to 15 days. Their claims were found by the district court to be without merit and do not present an issue in this appeal.

[2] A second claim, alleging the unconstitutional seizure of inmate property from their cells was severed for separate trial, pending the development of new regulations by the Department.

per prisoner. Of this total, however 15 hours had been assigned to two DSU inmates,[3] leaving a total of 11 hours available for the remaining 58 prisoners. The district court found,

> Because of the limitations on time available to DSU inmates, there is usually a lag of at least three weeks between the time when a request is made and the time when a visit is granted. A DSU inmate continually submitting requests can expect at best one or two visits to the law library each month.

In addition to this library access, defendants provided DSU inmates with writing materials and photocopies of legal material at no charge. Photocopies, but not books, could be ordered from the library between visits. DSU inmates could keep limited amounts of legal materials in their cells. While such inmates could also correspond and, on occasion, meet with their attorneys, the court found no evidence of "any program requiring legal assistance to all DSU inmates who require it ...."

Both parties supplemented these stipulated facts with oral testimony, and plaintiffs were allowed without objection to introduce nearly 30 affidavits from prisoners, some of which complained of inadequate opportunities to do legal research and file timely responses in ongoing lawsuits.

Upon consideration of this record, the district court held that plaintiffs had made a prima facie showing of "barred access." *Bounds*, 430 U.S. 817, 97 S.Ct. at 1492. The court found that a DSU inmate could expect no more than three hours of law library time per month. It concluded that

> [t]his amount of time plainly falls short of constitutional requirements ... especially when inmates are unassisted by persons trained in the law and must specify in advance the books which they wish to use. Legal research is frequently a process of moving from one book to another, depending on the citation found

in the sources consulted; this process is made extremely cumbersome, if it is not totally foreclosed, by MCI's provisions for library access for inmates in the DSU.

Finding no evidence that defendants had provided any program of assistance by persons trained in the law in lieu of adequate library access, the district court held defendants had failed to meet plaintiffs' prima facie case. *Rich v. Zitnay*, 644 F.2d 41 (1st Cir.1981).

While finding a constitutional violation, the district court recognized that any remedy would "necessarily affect the operation of a maximum security prison." It therefore sought guidance from the parties, asking them to attempt to develop a joint plan. When agreement could not be reached, the defendants recommended (without admitting that the existing program was inadequate) the following remedy: That defendants by order of court create a satellite law library in the DSU to be open to DSU inmates, one man at a time, for "at least 40 hours per week." That "[u]pon special request and for special needs," defendants permit plaintiffs to use the main law library for at least five hours per week, with help from an inmate legal clerk. And that defendants extend to plaintiffs "direct and personal" access to Massachusetts Correctional Legal Services attorneys and paralegals and to members of the Massachusetts bar.

Having received these recommendations, as well as others suggested by plaintiffs, the district court ordered that a satellite library in the DSU be established, but be made available for 56 hours each week. It directed that certain legal volumes be placed in the satellite library. It ordered that DSU inmates be allowed continued access to legal materials from the main prison library and continued use of legal materials in their cells. Finally, it ordered that defendants,

---

**3.** By state court order ten hours per week had been set aside for a particular prisoner. Another prisoner had been assigned five hours per week by prison authorities. A court order requiring an additional three hours per week for a third prisoner was under appeal at the time of trial.

Enter into an arrangement with a local law school pursuant to which second or third year law students, working under the supervision of a member of the bar, shall be available to assist [DSU] inmates for at least five hours per week.

## II.

Defendants accuse the district court of taking the *Bounds* requirement of meaningful access to the courts "out of context" and expanding it "beyond recognition." They attack the court's analysis as borrowing excessively from *Cruz v. Hauck*, 627 F.2d 710, 720 (5th Cir.1980), a case where the adequacy of library time was measured in terms of whether it allowed inmates to engage in "meaningful legal research." That standard, however, was the very standard articulated by defendants themselves in their post-trial memorandum; and, in any case, we find nothing in the district court's action which requires us to accept or reject the particular gloss placed on *Bounds* in *Cruz v. Hauck*. It is *Bounds* itself that requires authorities to provide "adequate law libraries," unless, as an alternative, prisoners receive "adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. Similarly without merit is defendants' claim that the district court erred in "assum[ing] that inmates are capable of performing any meaningful legal research." That argument was expressly rejected by the Supreme Court in *Bounds*, 430 U.S. at 826, 97 S.Ct. at 1497.

In a similar vein, defendants contend that because of valid security concerns, the court was wrong to suppose that the DSU inmates have a right to library access. The district court, however, expressly recognized that the inmates had "no absolute right" to library access as such, since "disciplinary and security considerations may weigh against ... [their] use of library facilities or contact with fellow inmates." *See Williams v. Leeke*, 584 F.2d 1336, 1339 (4th Cir.1978) (Haynsworth, J.) ("Reasonable steps to preserve prison security during 'library time' ... justified in the case of maximum security prisoners"); *Lovell v.*

*Brennan*, 566 F.Supp. 672, 696–97 (D.Me. 1983) (no library access required in such circumstances), *aff'd on other grounds*, 728 F.2d 560 (1st Cir.1984). The district court's position was merely that when a state chooses to fulfill its *Bounds* obligation, even to DSU inmates, solely or primarily by providing access to a law library, such access cannot be so attenuated as to be meaningless.

In applying this standard the district court considered both the time allowed in the library and the opportunity to conduct research once there. Standing alone, the time limits presented here—at most three hours per month per inmate seeking to conduct research—invite scrutiny. *See Cruz v. Hauck*, 627 F.2d 710 (5th Cir.1980) (questioning the adequacy of three hours per week); *Williams*, 584 F.2d at 1341 (three 45-minute library sessions per week, absent staff assistance, too limited "to be meaningful"); *Nadeau v. Helgemoe*, 561 F.2d 411 (1st Cir.1977) (rejecting one hour per week even where limited staff assistance present).

The requirement that inmates identify the specific volumes they wish to use *prior* to entering the library is also suspect, particularly where, as here, it appeared there was no help present, at the time most DSU inmates were in the library, to retrieve an additional book. As Judge Haynsworth stated in *Williams*, 584 F.2d at 1339, "It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult."

Defendants contend that the court gave inadequate weight to the availability of legal materials provided to plaintiffs in their cells. This, like other aspects just discussed, was largely a factual question on which we give considerable deference to the district court. While the provision of photocopies may ameliorate restrictions on library access, the evidence here suggested that the system for obtaining copies was haphazard. Restrictions on the amount of legal materials which could be kept in the cell—one of defendants' witnesses said two shoeboxes full—also limited the usefulness

of research outside the library. Plaintiffs' affidavits stated that excess property, including legal materials, was subject to confiscation. And, while prisoners were allowed to keep several books in their cells, the affidavits suggested that they tended to deteriorate rapidly after their hard covers were removed, as required by prison regulation. We cannot say the district court committed clear error in not giving greater weight to the research opportunities outside the library. Fed.R.Civ.P. 52(a).

■ Defendants claim that plaintiffs failed to establish actual prejudice to any inmate case resulting from defendants' alleged breach. Defendants assert such prejudice is a necessary element in establishing a case under *Bounds.* *See, e.g., Twyman v. Crisp,* 584 F.2d 352, 357–58 (10th Cir. 1978); *Bach v. Coughlin,* 508 F.2d 303, 308 (7th Cir.1974); *Isaac v. Jones,* 529 F.Supp. 175, 179 (N.D.Ill.1981). The district court, however, found prejudice in the instant case. Assuming without deciding that a showing of prejudice is required, we cannot say that the court's finding in this regard was clearly erroneous. Fed.R.Civ.P. 52(a). While the finding was derived from prisoners' affidavits, the affidavits were admitted without objection and we cannot say they provided an insufficient basis for this finding.

■ Defendants also complain that the court's findings were inadequate as they failed to specify whether the prejudicial claims involved constitutional issues. It is too late, however, for defendants to raise this issue. They did not make it below in their post-trial memorandum, nor did they file a motion under Fed.R.Civ.P. 59 asking the district court to modify its findings. *See Welch & Corr Construction Corp. v. Wheeler,* 470 F.2d 140, 141 (1st Cir.1972) (the district court was entitled to be told of any afterthoughts regarding errors in its handling of the case so that it could correct them if appropriate).

■ Defendants claim that the court erred in concluding that they had failed to rebut plaintiffs' prima facie case as required by *Rich v. Zitnay,* 644 F.2d 41. They assert that they conclusively showed that plaintiffs in fact had adequate access to the court, pointing to 66 suits maintained by DSU prisoners at the time of trial, including seven belonging to the named plaintiff, Richard Cepulonis. The district court, however, could properly discount this evidence since defendants have not indicated how many of the cases were begun when the inmates were in the DSU. From the record it appears that only three of the 66 suits were initiated during a DSU incarceration and of these three, two were begun by Cepulonis who was trained as an inmate law clerk.

The district court properly evaluated the steps taken by defendants to meet their *Bounds* obligation "as a whole." 430 U.S. at 832, 97 S.Ct. at 1500. We find no reversible error.

### III.

We turn next to the validity of the court-ordered remedy. Defendants say the district court's remedial order was an abuse of discretion in three respects: it ordered a satellite law library; it required specific volumes which defendants label as "needless and excessive resources"; and it required that defendants provide law student assistance. As administrators of the prison, defendants contend they were entitled to greater deference in selecting a remedy. *See Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

■ Except in one respect, we find no merit in these contentions. Concerning the satellite law library, the district court "scrupulously respected the limits of [its] role," ordering the creation of this facility only after the defendants, like the petitioners in *Bounds,* suggested it. 430 U.S. at 832–33. While there is a variance between the number of hours of access to the satellite library suggested by defendants ("at least 40 hours per week") and the number ultimately ordered (56 hours per week), defendants do not now complain of this increase, but report they have voluntarily

**6**

decided to provide 87.5 hours of access each week.

■ As for the court's determination of what volumes must be placed in the library, we see no abuse. When the defendants originally proposed a satellite library, they did not suggest what books to include. The court's list seems in keeping with the objectives stated in *Bounds*. This is not to say it could not, within constitutional limits, be shortened or, for that matter, lengthened or amended. The parties' dispute over the specific titles arises, at least in part, from defendants' decision to go ahead with creation of a satellite library between the time they recommended this remedy to the court and the time the order came down. The room they selected may be too small to accommodate the number of volumes ordered by the district court. But defendants apparently never told the court they were setting up a library before the court entered its order. Nor does it appear that defendants, except for requesting a stay, have asked the court to modify its order to reflect these changed conditions. Whether to reduce or modify the list or leave it the same is a matter we leave to the sound discretion of the district court.

■ The only item of relief which troubles us is the court's unexplained direction that the defendants provide, in addition to a satellite law library, at least five hours a week of assistance to DSU inmates by second or third year law students working under a lawyer's supervision. This is very different from defendants' proposal to permit DSU inmates to use the main law library, with an inmate legal clerk to assist them, for five hours a week.[4] It is not clear to us why or in what particular the constitutional standard in *Bounds* requires such relief.

*Bounds* requires only "adequate law libraries *or* adequate assistance from persons trained in the law," not both. 430

U.S. at 828, 97 S.Ct. at 1498. This is not to say a court may never order a mixture of library access and lawyer or paralegal assistance: an insufficiency of library time might have to be supplemented by a certain amount of assistance. Moreover, in order to provide an "adequate law library" some library personnel might be required to keep the books in order. But *Bounds* does not create an entitlement to legal aid assistance if library access is otherwise constitutionally adequate. *See* 430 U.S. at 830, 97 S.Ct. at 1499 ("adequate law libraries are one constitutionally acceptable method . . . ."). The district court does not explain why it rejected defendants' alternative nor what constitutional infirmity it believed existed even after creation of the satellite library.

When a *Bounds* violation has been found and defendant prison officials have offered a remedy, ordinarily their plan should be accepted unless it fails constitutional muster. If constitutionally defective, the court should explain why and, given the strong policies favoring deference to prison officials, *Procunier v. Martinez*, 416 U.S. at 404–05, 94 S.Ct. at 1807, should tailor its own alternative only after adequate consultation and with concern for security needs.

The mixed remedy originally proposed by defendants themselves in this case did not justify the court's unilateral substitution of a different remedy without either an explanation or opportunity for defendants to suggest their own modifications. There is an obvious difference between five hours of inmate librarian assistance in the main prison library and five hours of outside law student assistance in a facility adjunct to the DSU. The officials could rationally conclude that their alternative presented significantly fewer security problems. For one thing an inmate clerk may be more knowledgeable concerning the moves of other inmates and, therefore, less likely to

---

**4.** Defendants' proposal read as follows:

Upon special request and for special needs, Block 10 inmates may use the main M.C.I.-Walpole Law Library. The main law library will be available to meet these special needs

for at least five hours each week. An inmate law clerk assigned to the main M.C.I.-Walpole law library will be available to assist Block 10 inmates who request access to the main law library and who request assistance.

expose himself or others to unnecessary danger. For another, there are undoubtedly risks whenever the institution is opened to outsiders. And the single inmate clerk proposed by defendants seems more of a library facilitator than the mini-legal aid service ordered by the court.

Assuming any supplementation of the satellite library is constitutionally required—a point on which we presently take no position—the devising of such a supplement is best left, in the first instance at least, to the officials charged with running the institution on a day-to-day basis, absent a finding of bad faith or undue delay. Here, however, neither exception is suggested.

*We affirm the order of the district court insofar as it requires the establishment of a satellite law library, including enumerated volumes (except as the court may choose to modify), and vacate the order insofar as it requires defendants to provide assistance by students from law schools. The case is remanded for further consideration consistent with this opinion.*